DAVID D. LIN (DL-3666)
JUSTIN MERCER (JM-1954)
**LEWIS & LIN, LLC**
45 Main Street, Suite 608
Brooklyn, NY  11201
David@iLawco.com
Justin@iLawco.com
Telephone: (718) 243-9323
Facsimile: (718) 243-9326

*Attorneys for Plaintiff*
JOSH COHEN

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOSH COHEN,<br><br>                              *Plaintiff*,<br><br>v.<br><br>ROBYN SWIRLING,<br><br>                              *Defendant*. | Case No: 17-CV-9019<br><br><br>**<u>COMPLAINT</u>** |

Plaintiff Josh Cohen, ("Cohen" or "Plaintiff") by his attorneys Lewis & Lin LLC, for his complaint for damages and injunctive relief against Defendant Robyn Swirling ("Swirling" or "Defendant"), alleges as follows:

### <u>STATEMENT OF CASE</u>

1.      Plaintiff brings this action for defamation, unfair competition, tortious interference for, *inter alia*, the malicious, willful and unlawful dissemination of false, misleading, disparaging and defamatory statements by Defendant regarding Plaintiff.

2.      Since then, Defendant Swirling has used her platform to continue perpetrate an attack campaign against Plaintiff by publishing and communicating false, defamatory and

completely fabricated statements to various industry conference organizers around the country. Defendant Swirling's concerted efforts and false accusations threaten to destroy Plaintiff's entire reputation and livelihood. As a result of Defendant's misconduct, Plaintiff has been and continues to be substantially and irreparably harmed.

**PARTIES**

3.     Plaintiff Josh Cohen ("Cohen") is a private individual and domiciled in New York, New York.

4.     Upon information and belief, Defendant Robyn Swirling ("Defendant or Swirling") is an individual who is residing and domiciled in the District of Columbia at 751 Fairmont Street NW, Apt. 3, Washington DC 20001.

**JURISDICTION AND VENUE**

5.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332, as the parties are citizens of different states and the amount in controversy exceeds $75,000.

6.     This Court has personal jurisdiction over Defendant pursuant to CPLR § 302 because she committed a tortious act without the State of New York, that she expected or should have reasonably expected to have consequences in the State of New York and, upon information and belief, derives substantial revenue from interstate or international commerce and within the State of New York.

7.     Defendant further subjected herself to this Court's jurisdiction by invoking the benefits and protections of this State in an attempt to cause harm within the State of New York. Defendant orchestrated, published and communicated false, defamatory and completely fabricated statements concerning Plaintiff, a New York resident, made between November 2016

and the present while Defendant engages in substantial competition with Plaintiff—thus causing Plaintiff harm in New York.

8.      Venue is proper in this judicial district under 28 U.S.C. § 1391(b), since a substantial part of the conduct that is the subject of this action occurred in this district.

## BACKGROUND COMMON TO ALL CLAIMS

9.      Plaintiff Cohen is a gay male, anti-discrimination and anti-bullying activist. Plaintiff is also a software engineer by trade, and is the founder and chairman of the Open Supporter Data Interface project ("OSDI") and owner of the communication technology company, Marriage Hero, or "Hero."

10.     The OSDI effort seeks to create and define an API and data structures for interoperability among products in the progressive cause-based, campaign and non-profit marketplaces.

11.     Marriage Hero is a field organizers' robot, that can send out custom event communications, reminders and follow-ups through multiple channels, manage attendee responses, and sync all activities with CRM's and other systems such as VAN, Action Network and others.  Hero software uses the OSDI API, and thus, through Plaintiff leadership role at OSDI, Hero also plays a significant part in the OSDI data standardization initiative.

12.     As such, Plaintiff's professional life includes working on civil rights and other progressive causes, such as empowering social justice efforts and combating sexual abuse and harassment—industry conferences, such as Wellstone's RootsCamp and Netroots Nation, are an essential part of that workplace.

13.     RootsCamp is an annual conference of progressive organizers from around the country, including from New York state, where, *inter alia*, "data geeks," "field innovators,"

"climate change organizers," and "marriage equality advocates" come together support the honest change of ideas.

14.     Netroots Nation is the largest annual conference for progressives, drawing thousands of attendees from around the country, including from New York state, and beyond.

15.     Plaintiff routinely presents at these and other progressive activism conferences on behalf of Hero and OSDI.  Since conference attendance is a critical element of the progressive activism workspace and Hero's mission—with some of these conferences and conventions only held annually—being excluded from same constitutes significant career and professional harm.

16.     In fact, in advance of RootsCamp 2016, Plaintiff contracted with Wellstone to have a booth at the exhibition hall of RootsCamp on behalf of Hero.

17.     While Plaintiff's motivation for this work is at most times professional, via Hero, Plaintiff was also a victim of sexual misconduct, abuse and harassment by a fellow activist who was much more powerful in the community than Plaintiff.

18.     Through that lens, in 2016, Plaintiff began brainstorming, via a listserv, with a group of RootsCamp conference organizers  on processes and procedures for adjudicating conflicts related to abuse and harassment at these progressive conferences.

### Defendant and her Wrongful Conduct

19.     One of the leaders of the group was Defendant Swirling, also a progressive activist, who disagreed with Plaintiff's ideas shared on the listserv regarding how to handle conflicts between victims and abusers at progressive conferences like RootsCamp.

20.     Of Defendant Swirling's many policy proposals she shared on the listserv, she championed removing and banning accused abusers from conferences immediately.

21.     In response, Plaintiff attempted to persuade Defendant Swirling to exercise

caution in proposing a policy that would circumvent due process and rob everyone involved of

an opportunity to capitalize on the professional opportunities at these progressive conferences.

22.     In defense of Plaintiff's perspective, Plaintiff then shared with Defendant

Swirling (and more than half of dozen others on the listserv) his history with sexual abuse and

harassment by the fellow powerful activist—including an anecdote about how Plaintiff attempted

to resolve a conflict between Plaintiff's abuser and Plaintiff when they jointly attended a

progressive conference.

23.     In response, Defendant Swirling wrote, in relevant part as follows: "Being

removed or banned from an event means possibly missing out on professional opportunities, yes

. . . I understand your comments and concerns come from personal experiences, Josh. But false

accusations are rare. . . . Rather, it's vital that we develop systems which allow people to come

forward about the legitimate harassment they've received and be met with protocols and

processes that remove the harasser from that space, so the accuser can actually go about their

business at the conference safely." In other words, Defendant Swirling recognized that these

progressive conferences, such as RootsCamp, provided professional opportunities to is attendees.

24.     Plaintiff responded in general agreement with Defendant Swirling's viewpoint,

but echoed his concerns about fairness, justice, gender diversity within the listserv and

community ownership of the policy recommendations of the group.

25.     In response, Swirling purported to kick Plaintiff off the listserv. Thereafter,

Swirling fabricated a false, written narrative accusing *Plaintiff* of engaging in "violence" and

"harassment" on the listserv that she published to various third parties, upon information and

belief, across the Internet and in this judicial district.

26.     Upon information and belief, Swirling subsequently shared her false, written

narrative with third parties including conference organizers, engaging in fear mongering, to bully and exclude Plaintiff from shared and inclusive spaces.

27.     In an abundance of caution, in advance of the RootsCamp conference, Plaintiff informed a RootsCamp organizer, who ironically was an ally of Plaintiff's abuser, as to the listserv incident with Swirling. The RootsCamp organizer/ally of Plaintiff's abuser told Plaintiff that it should not be a problem that would affect Plaintiff's attendance at and promotion of Hero or OSDI at the conference.

### Defendant shouts false statement about Plaintiff in a crowded room

28.     Then, on or about November 19, 2016, at the RootsCamp conference, in a crowded room during a panel on, *inter alia*, rape culture, abuse and harassment, Defendant Swirling—upon information and belief, in concert with the ally of Plaintiff's abuser who was also a RootsCamp organizer —shouted from across the room at Plaintiff: "**[a] male has entered the room who has engaged in repeated violence, persistent harassment, and invaded our space!**"

29.     The room then erupted into a panicked mob, while Plaintiff was forcibly pushed and then removed from the auditorium.  While Plaintiff was being escorted from the room, he stated that he would publish the email argument itself, along with his defense, so the community could evaluate the facts for themselves.

30.     All of the Defendant's statements concerning Plaintiff are false and completely fabricated.  They have been stated by Defendant for the overt purpose of destroying the personal and professional reputation of Plaintiff.

31.     Immediately after the incident, Defendant then attempted to interfere with Plaintiff's leadership role at OSDI.

32.     On or about November 20, 2016, Defendant Swirling repeated her accusation that *Plaintiff had* engaged in "repeated violence" and "harassment" to a member of OSDI's leadership committee, who was in attendance at the RootsCamp conference.

33.     That night, Plaintiff received a telephone call from a member of OSDI's leadership committee.  This member explained to the Plaintiff that he was aware of Plaintiff's stated intent to publish the facts. Plaintiff explained to the OSDI member that Defendant Swirling's oral statement at the conference session was false, and stemmed from her disagreement with Plaintiff via the email listserv.

34.     Then, the member of OSDI's leadership committee, who claimed that they were standing next to Defendant Swirling at the time of the call with Plaintiff, told Plaintiff not to publish the email correspondence with Defendant Swirling and threatened to coordinate the removal of Plaintiff as chairman of OSDI if he did so publish it.

35.     Then, Defendant Swirling and the RootsCamp organizer/ally of Plaintiff's abuser coordinated to present false facts to Wellstone, which expedited Plaintiff's and Hero's expulsion from the conference.

36.     Because of the integral role that OSDI plays in the promotion of Hero at the RootsCamp conference, Defendant's efforts and false statements caused Plaintiff reputational and professional harm.

37.     Specifically, the COO of Wellstone called Plaintiff and told him she had spoken with Defendant Swirling. Upon information and belief, Defendant Swirling repeated her accusation that Plaintiff had engaged in "repeated violence" and "harassment" to the COO of Wellstone.

38.     As a result of Defendant's false statements to the Wellstone COO, the Wellstone

COO told Plaintiff that Hero's booth in the exhibition hall of RootsCamp would be closed, and not to come back to run the OSDI session at RootsCamp, nor attend any other RootsCamp session, nor to enter the physical space of the entire conference.

39.     Since then, in an intentional effort to divert business and professional opportunities away from Plaintiff, and to cause injury to Plaintiff, Defendant has continued to provoke conflicts at industry conferences and begun to contact conference organizers in an effort to dissuade them from permitting Plaintiff to present at and/or attend these professional conferences and from doing further business with him.

**Defendant continues her campaign of false statements at Netroots Nation**

40.     Then, on or about August 11, 2017, Plaintiff was scheduled to present on behalf of OSDI at the Netroots Nation conference.

41.     In advance of the scheduled session, Plaintiff noticed that both Defendant Swirling and the RootsCamp organizer/ally of Plaintiff's abuser had registered to attend Plaintiff's OSDI session.

42.     In an abundance of caution, Plaintiff informed the Executive Director of Netroots Nation as to the events that took place at RootsCamp, Defendant Swirling's false statements, and complained about the fact that both Defendant Swirling and the RootsCamp organizer/ally of Plaintiff's abuser had, coincidentally, signed up for Plaintiff's session. Plaintiff indicated that they were welcome to attend, as long as they were constructively contributing on the topics of OSDI, but that he did not want to be harassed.

43.     At first, the Executive Director of Netroots Nation agreed that this was okay.

44.     Despite registering, upon information and belief, Defendant Swirling and the RootsCamp organizer/ally of Plaintiff's abuser did not attend Plaintiff's Hero/OSDI session.

45.     Thereafter, the Executive Director of Netroots Nation changed his position, after he claimed to have spoken with Defendant Swirling, and told Plaintiff he was not allowed to attend three various sessions at Netroots Nation which were the ones related to combating rape culture and sexual abuse.

46.     Upon information and belief, Defendant Swirling repeated her accusation that Plaintiff had engaged in "repeated violence" and "harassment" to the Executive Director of Netroots Nation.

47.     When Plaintiff complained to the Executive Director of Netroots Nation that he was interested in attending the sessions (in particular those of which Defendant Swirling was not the presenter at or, to Plaintiff's knowledge, would be attending)—for the professional opportunities related to Plaintiff's work in combating rape culture, considering Plaintiff was a fellow victim who had spoken up about his own experience with sexual abuse, and Plaintiff's professional interests regarding sexual abuse workplace protections work within Hero—he responded "if you go, I will take your [conference] credentials away."

48.     As such and as a result of Defendant Swirling's false comments, Plaintiff was not permitted to attend any sessions at Netroots Nation related to rape culture.  Plaintiff asked the Executive Director to commit his instructions in writing so there would be no ambiguity as to the sessions he could attend. The Executive Director refused, which made it impossible for Plaintiff to attend any Netroots Nation session due to the fear he would be stripped of his credentials.

49.     Plaintiff has received numerous inquiries about the truthfulness of the statements of Defendant's statement at the RootsCamp conference and her false, written narrative.  Many of these inquirers have expressed anger, frustration, confusion or dismay to Plaintiff based on the content of same.

50.    Upon information and belief, Defendant Swirling published the false, written narrative and shouted the false oral statement for the sole purpose of harming Plaintiff's reputation and causing him to lose  revenue as the statements within bear directly on Plaintiff's character and his consulting services with Hero, as well as OSDI's mission—where Plaintiff has a leadership role.

51.    The statement that Plaintiff "has engaged in repeated violence [and] persistent harassment," is and has been devastating to his reputation and business interests—considering Defendant's penchant for repeating these false accusations to conference organizers where Plaintiff attends or presents on behalf of Hero/OSDI, or engages in business development for his consulting services with Hero.

52.    Defendant made the above statements at these high-profile progressive conferences precisely because she knew that Plaintiff would "miss[] out on professional opportunities."

53.    Indeed, Plaintiff and Defendant both work in the progressive activism space, and have founded and/or led organizations that deal with same.

54.    Thus, upon information and belief, Defendant knew that her statements (both orally and in writing) would stifle competition with and cause economic harm to Plaintiff.

55.    Plaintiff had and continues to have contractual relationships with conference and conventions he attends.

56.    Defendant stated, scripted and caused to be disseminated the above statements as part of an intentional, malicious and systematic campaign to interfere with Plaintiff's contractual relationships with conferences, and upon information and belief, to wreak havoc on Plaintiff's business by inducing those conference organizers to expel and/or to cease doing business with

Plaintiff and his consulting services business with Hero.

## FIRST CLAIM FOR RELIEF
### SLANDER AND LIBEL

57.    Plaintiff realleges and incorporates by reference Paragraphs 1 through 56 as though fully set forth here.

58.    Defendant has intentionally made knowingly false statements of fact about Plaintiff orally and in writing across the Internet.

59.    Additionally, and/or alternatively, Defendant has espoused and/or concurred in the charges made by others to launch an unwarranted personal attack of her own against Plaintiff and upon Plaintiff's honor, dignity and standing in the community.

60.    These statements were made maliciously and willfully, and were intended to cause harm to Plaintiff's integrity and personal reputation.

61.    The aforementioned statements were false when made and Defendant knew or should have known that the statements were false when made.

62.    The statements were made with reckless disregard for their truth or falsity or with knowledge of their falsity and with wanton and willful disregard of the reputation and rights of Plaintiff.

63.    The aforementioned statements where made of and concerning Plaintiff, and were so understood by those who heard Defendant and/or read Defendant's publication of them.

64.    Among other statements, Defendant falsely claimed that Plaintiff "has engaged in repeated violence [and] persistent harassment."

65.    These statements were false, and were published to third parties and, upon information and belief, across the Internet.

66.    Defendant has no privilege to assert the false and disparaging statements.

67.     As a result of Defendant's acts, Plaintiff has suffered irreparable damage to his reputation and further damages in an amount to be determined at trial.

68.     As a result of the willful and malicious nature of the defamation, Plaintiff is entitled to punitive damages.

## SECOND CLAIM FOR RELIEF
## UNFAIR COMPETITION

69.     Plaintiffs realleges and incorporates by reference Paragraphs 1 through 56 as though fully set forth here.

70.     Defendant made various false statements concerning Plaintiff and engaged in interference with Plaintiff's business.

71.     Upon information and belief, by disseminating the false and disparaging statements that Plaintiff "has engaged in repeated violence [and] persistent harassment," Defendant intended to use her defamatory and false statements as a means to generate business by turning interest away from Plaintiff, and redirecting them to Defendant.

72.     These acts and others stated above constitute a pattern of common law unfair competition, entitling Plaintiff to recovery of compensatory and punitive damages, in an amount to be proved at trial, including compensation for Plaintiff's time, effort and attorneys' fees.

## THIRD CLAIM FOR RELIEF
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

73.     Plaintiffs realleges and incorporates by reference Paragraphs 1 through 56 as though fully set forth here.

74.     Defendants statements that Plaintiff "has engaged in repeated violence [and] persistent harassment" occurred intentionally with a desire to harm Plaintiff.

75.    The manner by which Defendant sought to harm Plaintiff, including the steps described herein via shouting at the public at large to various conference goers in a crowded room, was extreme and outrageous.

76.    As a result of Defendant's past and continued wrongful acts, including, *inter alia*, besmirching Plaintiff's reputation, Plaintiff has experienced extreme emotional distress.

77.    As a result of Defendant's past and continued wrongful acts, the character and reputation of Plaintiff were harmed and he suffered mental anguish and personal humiliation.

78.    As a direct and proximate result of Defendant's past and continued wrongful acts, Plaintiff has been materially and substantially damaged in an amount to be proved at trial, including compensation for Plaintiff's time, effort and attorneys' fees.

## FOURTH CLAIM FOR RELIEF
## TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS AND PROSPECTIVE CONTRACTUAL RELATIONS

79.    Plaintiff realleges and incorporates by reference Paragraphs 1 through 56 as though fully set forth here.

80.    Plaintiff had existing contracts with its conferences and reasonably expected that its contractual relationships with those conferences would continue into the future.

81.    Defendant knew of Plaintiff's contracts.  Indeed, Defendant was well aware that Plaintiff had a Hero booth at RootsCamp and a session at Netroots Nation because she registered to a session to be directed by Plaintiff at same.

82.    By the wrongful conduct described above, Defendant intentionally and improperly interfered with Plaintiff's contracts with those conferences and did so with the intent and purpose of damaging Plaintiff's business and reputation.

83.     Defendant's interference caused Plaintiff's conference organizers and internal leadership at OSDI confusion, to withdraw his scheduled attendance and to cease doing business with Plaintiff.

84.     During at least two conferences where Plaintiff was a scheduled attendee or had booths for his business, Hero, conference organizers received defamatory oral communications from Defendant and then cancelled Plaintiff's further attendance at those conferences.

85.     Specifically, during RootsCamp, Defendant communicated false and misleading statements concerning Plaintiff, which resulted in Plaintiff's Hero exhibition booth at RootsCamp being prematurely closed, resulting in lost business and sales opportunities for himself and his software consulting business, Hero.

86.     As a result of Defendant's actions, Plaintiff has been and continues to be damaged in an amount to be determined at trial.

87.     Plaintiff has also suffered and will continue to suffer irreparable harm in the form of damage to his reputation as a result of Defendant's conduct described herein.

88.     While an award of damages may be adequate to compensate Plaintiff for the loss of conference fees paid, an award of damages will not be adequate to compensate Plaintiff for the damage to his reputation caused by Defendant.  Plaintiff has suffered and will continue to suffer irreparable harm unless injunctive relief is granted.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendant awarding Plaintiff:

1.     Enter a judgment declaring that Defendant's conduct constitutes slander and libel;

2.     Enter a judgment declaring that Defendant's conduct constitutes unfair competition;

3.      Enter a judgment declaring that Defendant's conduct constitutes intentional infliction of emotional distress;

4.      Enter a judgment declaring that Defendant's conduct constitutes tortious interference;

5.      Award Plaintiffs compensatory damages according to proof at trial but in an amount not less than $500,000.00;

6.      Award Plaintiffs punitive damages pursuant to the common law, due to Defendants' willful and wanton behavior;

7.      Enter a temporary and permanent order, enjoining Defendant from publishing the statements constituting slander and/or libel identified above, or anything similar thereto, in relation to Plaintiff and directing Defendant and her respective agents, servants, employees, successors and assigns, and all other persons acting in concert with or in conspiracy with or affiliated with Defendant, to take all remedial efforts to repair Plaintiff's reputation in the community;

8.      Award Plaintiff his reasonable attorney's fees, costs and disbursements in this civil action; and

9.      Enter such other and further relief to which Plaintiffs may be entitled as a matter of law or equity, or which the Court determines to be just and proper.

Dated:  Brooklyn, New York
        November 17, 2017

                                LEWIS & LIN, LLC

                                By:  _/s/ David D. Lin_
                                David D. Lin, Esq. (DL-3666)
                                Justin Mercer, Esq. (JM-1954)
                                45 Main Street, Suite 608
                                Brooklyn, NY 11201
                                Tel: (718) 243-9323

Fax: (718) 243-9326
Email: david@iLawco.com
          justin@iLawco.com

*Counsel for Plaintiffs*